Evelyn R. Storch #016471981
HARWOODLLOYD, LLC
130 Main Street
Hackensack, NJ  07601
201-359-3556
estorch@harwoodlloyd.com

OF COUNSEL:
ROSTEN LAW PLLC
Keith Rosten
Kathleen B. Havener
1020 16th Street NW
Suite 205
Washington, DC 20036
202-741-9190
krosten@rostenlaw.com
kbhavener@havenerlaw.com

<u>**IN THE UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE DISTRICT OF NEW JERSEY**</u>

| | | |
|---|---|---|
| **CHARLES MAIMONE** | ) | |
| 8 Catania Court | ) | |
| Voorhees, NJ 08043 | ) | **CASE NO:** |
| | ) | |
| and | ) | |
| | ) | **JUDGE:** |
| **JOSEPH S. CARUSO** | ) | |
| 70 Timberline Drive | ) | |
| Voorhees, NJ 08043 | ) | *Jury Trial Demanded* |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **TIMOTHY MULLIGAN** | ) | |
| 45-C Heisz Street | ) | **VERIFIED COMPLAINT** |
| Kingston, PA 18704 | ) | |
| | ) | |
| **SUN CHA BLANCHETT** | ) | |
| 45-C Heisz Street | ) | |

1

Kingston, PA 18704                          )
                                            )
**JAMES KIRWIN**                            )
4 Heatherstone Way                          )
Thornton, PA 19373                          )
                                            )
**IRAN CRUZ**                               )
17 Mapleseed Drive                          )
Dallas, PA 18612                            )
                                            )
and                                         )
                                            )
**NEW MILLENNIUM GAMING LLC**               )
c/o Timothy Mulligan                        )
45-C Heisz Street                           )
Kingston. PA 18704,                         )
                                            )
                    **Defendants.**         )
                                            )
_____     )

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

By and through their counsel, Plaintiffs Charles Maimone and Joseph S. Caruso allege, upon information and belief, except to those allegations that pertain to the plaintiffs themselves, which they allege upon knowledge, for their complaint against the Defendants aver and state as follows:

## The Parties[1]

1.      Plaintiff Charles Maimone is an individual who resides at 8 Catania Court in Voorhees (Camden County), New Jersey 08043.

2.      Plaintiff Joseph S. Caruso is an individual who resides at 70 Timberline Drive Voorhees, (Camden County), New Jersey 08043.[2]

---

[1] Headings in this Complaint are solely for the convenience of the Court and are not intended to impact or limit the meaning of any allegations set forth herein.

2

3.     Defendant Timothy Mulligan ("Mulligan") is an individual residing at 45-C Heisz Street, Kingston, Pennsylvania 18704. Mulligan was or is an officer and manager of Defendant New Millennium Gaming LLC. Mulligan is listed on the company website as the Founder and President of Defendant New Millennium Gaming LLC and owns an ownership interest therein.

4.     Defendant Sun Cha Blanchett ("Blanchett") is an individual residing at 45-C Heisz Street, Kingston Pennsylvania 18704. Blanchett is the live-in girlfriend of Defendant Mulligan. Upon information and belief, she is or was an officer and/or manager of Defendant New Millennium Gaming LLC. Blanchett owns or owned an ownership interest in Defendant New Millennium Gaming LLC.

5.     Defendant James Kirwin ("Kirwin") is an individual residing at 4 Heatherstone Way, Thornton, PA 19373. Kirwin was or is a manager of New Millennium Gaming LLC and is listed on the company website as the CEO and General Manager. Kirwin owns an ownership interest in New Millennium Gaming LLC.

6.     Defendant Iran Cruz ("Cruz") is an individual residing at 17 Mapleseed Drive, Dallas, PA 18612. Cruz was or is a manager and officer at Defendant New Millennium Gaming LLC. He holds himself out as Vice President of Defendant New Millennium Gaming LLC, and owns an ownership interest in New Millennium Gaming LLC.[3]

7.     Defendant New Millennium Gaming LLC ("NMG" or the "Company") is a limited liability company organized on or about October 10, 2013 under the laws of the Commonwealth of Pennsylvania. NMG uses as its mailing address the apartment of its

---

[2] Collectively, the Plaintiffs are referred to herein as the "Plaintiffs" or the "Investors."

[3] The individual Defendants are referred to collectively herein as the "Defendant Managers."

founder, Defendant Mulligan, 45-C Heisz Street, Kingston, PA 18704. NMG's website address is www.newmilleniumgaming.com.

8.    The primary purpose of NMG is to market and sell a product called the OmniTable.

## Jurisdiction and Venue

9.    Jurisdiction is proper in this Court pursuant to 28 U.S. Code § 1331, because this matter arises under the laws of the United States. Jurisdiction is also proper pursuant to 28 U.S. Code § 1332(a)(1) as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00.

10.    This Court is a proper venue for this action pursuant to 28 U.S. Code § 1391(b)(2) in that "a substantial part of the events or omissions giving rise to the claim[s]" occurred in this judicial district.

11.    Defendants are subject to this Court's jurisdiction. NMG offered and sold unregistered securities in New Jersey. All funds paid over to Defendants by Plaintiffs were paid in New Jersey. All such funds originated from banks located in New Jersey. All representations made by Defendants to Plaintiffs occurred in New Jersey. All alleged fraudulent and unlawful acts and misrepresentations by Defendants were made in person to Plaintiff in New Jersey or were received by Plaintiffs in New Jersey via text message, email, or telephone. Many in person meetings between Plaintiffs and various Defendants occurred at Caffe Aldo Lamberti on Rt. 70 in Cherry Hill, New Jersey; at Starbucks on Evesham Road in Cherry Hill, New Jersey; at Starbucks on Rt. 70 in Cherry Hill, New Jersey; at Plaintiff Caruso's residence in Voorhees, New Jersey; in the (now defunct) Taj Mahal Casino in Atlantic City, New Jersey; and at the (now-defunct) Fornelletto's Restaurant in Atlantic City, New Jersey.

## Nature of the Action

12.     Plaintiffs bring this action derivatively in the right and for the benefit of NMG against the Individual Defendants to recover damages and to obtain specific equitable relief for breach of their fiduciary duties, breach of contract, breach of the covenant of good faith and fair dealing, for committing waste, for conversion, for their unjust enrichment, and for diversion of company opportunities.

13.     Plaintiffs also sue directly for damages and to obtain specific equitable relief based on the Defendant Managers' acts, for which NMG is vicariously liable, committed directly against the individual Plaintiffs, including violations of Section 10(b) of the Securities Exchange Act of 1934, 48 Stat. 891, as amended, 15 U.S.C. §78j(b), and Securities and Exchange Commission Rule 10b-5, 17 CFR §240.10b-5; and violations of Title 49 of the New Jersey Revised Statutes; fraud; negligent misrepresentation; unjust enrichment; conversion; civil conspiracy; breach of their fiduciary duties, breach of contract, breach of the covenant of good faith and fair dealing,.

**Factual Allegations**

14.     Defendant NMG is a limited liability company organized on October 10, 2013 under the laws of the Commonwealth of Pennsylvania by Defendant Mulligan for the purposes of developing, marketing and selling a unique electronic casino table called the OmniTable.

15.     Defendant NMG's Operating Agreement, a true and correct copy of which is attached as Exhibit 1 to the Affidavit of Joseph Caruso in Support of Verified Complaint and Order to Show Cause ("Caruso Affidavit"), filed herewith, was executed by all the Defendant Managers.

16.     The OmniTable is an electronic table developed for use in casinos for a variety of card games. It is shaped like a conventional blackjack table. The OmniTable has a non-

5

interactive light-emitting diode ("LED") surface made of a textile called "clear felt." The OmniTable can be switched electronically into any game that is played on a blackjack style table. A live dealer deals cards on the OmniTable.

17.     The OmniTable is the subject of a patent issued to Defendant Mulligan, *i.e.*, US Patent No. 9,098,969 issued June 18, 2014, and patent applications, *i.e.*, US Patent Application Nos. 14/816,579 (August 3, 2015); 14/930,881 (November 3, 2015); 61/976,230 (April 10, 2014); and 61/837,321 (June 20, 2013) made in the name of Defendant Mulligan. Hereinafter, the patent and patent applications are referred to as the "OmniTable IP" (Intellectual Property).

## Sale of Unregistered Securities

18.     None of the Defendants has filed a registration statement under the Securities Act of 1933 or any other applicable federal law nor are/were the ownership interests in NMG that Defendants sold registered under either the New Jersey Uniform Securities Act or the federal securities laws.

19.     The Defendants and NMG are not and were not exempt from registering nor were the ownership interests in NMG exempt from registration under the Securities Act of 1933 or any other applicable federal law nor were they exempt from registration under the New Jersey Uniform Securities Act.

20.     The ownership interests in NMG constitute "securities" under federal and state law. By offering to sell interests in NMG, an LLC, Defendants repeatedly offered Plaintiffs "contract[s], transaction[s] or scheme[s] whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party," which the United States Supreme Court has held to constitute an offer of the sale of securities.

6

21.     The Defendants continue to offer the unregistered securities for sale to the public. On NMG's website, visitors are invited to "Feel free to use the contact form, email or call us to talk about our new developments, testing and investing opportunities." This invitation constitutes a continuing offer to sell unregistered securities to the public.

**False Statements to Induce Plaintiff Maimone's Investment**

22.     Plaintiff Maimone first heard of NMG and the OmniTable from another investor, Stephanie Lawlor, in Ocean City, New Jersey, in July 2015. Ms. Lawlor introduced Plaintiff Maimone to Defendant Mulligan via telephone.

23.     Plaintiff Maimone had multiple conversations with Defendant Mulligan by telephone shortly after their introduction.

24.     In Plaintiff Maimone's multiple conversations with Defendant Mulligan in July, August, and September 2015, Defendant Mulligan made material affirmative misrepresentations as the Founder and President of NMG.

25.     Defendant Mulligan represented that he was the inventor of the OmniTable and its technology, and that NMG held the OmniTable IP. These statements were false, since NMG did not then and has never held the OmniTable IP.

26.     Defendant Mulligan represented to Mr. Maimone that he had over twenty years of experience in the gaming industry, that his experience gave him unique and superior knowledge and skill in the industry, and that he knew many casino executives. Defendant Mulligan's statements were false in that Mulligan's experience and familiarity with casino executives was not as he represented them to be.

27.     Defendant Mulligan further represented to Mr. Maimone that he had a team of professionals working for him at NMG who had similar experience, insight, skill, and contacts in the casino industry. Defendant Mulligan's statements were false in that the

7

professionals working with Defendant Mulligan did not have an appropriate level of experience, insight, skill, and contacts in the casino industry.  Kirwin, for example, is or was an executive in the pharmaceutical industry and was never an executive in the casino industry.

28.     Defendant Mulligan represented to Mr. Maimone that NMG's experience, insight, skill, and contacts in the casino industry would make selling the OmniTable to casinos very easy and that NMG would have sales in the millions of dollars within the next year (*i.e.*, by 2016) and $25 million in annual profits within five years. Mr. Mulligan's statements were false in that NMG did not have the experience, insight, skill, and contacts in the casino industry to appropriately market and sell the OmniTable. In addition, Mulligan made promises and representations as to the future which were beyond reasonable expectation and/or were unwarranted by existing circumstances.

29.     Defendant Mulligan represented to Mr. Maimone that other entities were interested in purchasing the OmniTable technology outright, and that NMG was worth $50 million in 2015, with a potential value of $100 million or more. These statements were false in that no other entities were interested in purchasing the OmniTable IP outright.

30.     Defendant Mulligan informed Mr. Maimone that NMG expected to have several hundred tables placed into operation immediately after the beta testing was completed, and that beta testing would be underway during the summer of 2015.[4] These statements were false in that beta testing had not been arranged nor had post-beta testing placement of tables been set up.

---

[4] In this context, "beta testing" means placing operational OmniTables in active use in live casinos to ensure their practicability for their intended use.

8

31.    During their telephone conversations, Defendant Mulligan offered to sell to Mr. Maimone a 5% ownership interest in NMG in exchange for an investment of $160,000.

32.    A meeting was scheduled between Defendant Mulligan and Mr. Maimone. Because Mr. Maimone had not yet agreed to purchase the full 5% share in NMG, Defendant Mulligan instructed Plaintiff Maimone that, in exchange for a 2.5% interest in NMG, he should bring to the meeting an $80,000 check made payable to Timothy Mulligan personally.

33.    The first meeting between Defendant Mulligan and Plaintiff Maimone occurred in August 2015 at Forneletto's Restaurant in Atlantic City, New Jersey.

34.    Defendant Mulligan brought Defendant Kirwin with him to the meeting. Defendants Mulligan and Kirwin made affirmative misrepresentations, Defendant Mulligan as the Founder and President of NMG and Mr. Kirwin as its CEO. Defendant Mulligan's and Defendant Kirwin's statements to Plaintiff Maimone were false. Mulligan made the same representations described in the above paragraphs. Defendant Kirwin repeated the same misrepresentations and omissions that Defendant Mulligan had made.

35.    In exchange for a 2.5% interest in NMG, Plaintiff Maimone brought an $80,000 check made payable to Timothy Mulligan personally to his first meeting with Defendants Mulligan and Kirwin in August 2015 at Forneletto's Restaurant in Atlantic City.

36.    Both Defendants Mulligan and Kirwin repeated Defendant Mulligan's prior representations: (1) that NMG was then worth $50 million; (2) that NMG owned the OmniTable IP; (3) that the beta testing would happen shortly; and that (4) after the beta testing was complete NMG would sell hundreds of Omni Tables to casinos worldwide. These statements were false in that NMG was not worth anything without the OmniTable

9

IP which it did not then own and has never owned; beta testing had not been arranged; and post-beta testing placement and sales of the OmniTable had not been secured.

37.    Defendants Mulligan and Kirwin repeatedly assured Mr. Maimone that no one else in the world could make these tables because NMG held the OmniTable IP. They assured him that his investment was secure. These statements were false in that (1) the OmniTable IP did not belong to NMG and (2) no one—neither the Individual Defendants nor NMG itself—was acting in any way to protect the IP in any case.

38.    With Defendants Mulligan and Kirwin, Mr. Maimone attended the Global Gaming Expo ("G2E") between September 29 and October 1, 2015 in Las Vegas, Nevada. According to its marketing materials, G2E is the international gaming trade show and conference "by the industry and for the industry" where gaming executives and buyers meet innovators and sellers of new gaming concepts. Mr. Maimone was impressed with the interest in the table at the G2E conference and with Defendants Mulligan's and Kirwin's representations about the OmniTable made to him and to potential purchasers and/or other investors.

39.    By the time of the G2E conference at the end of September and first of October 2015, Defendants Mulligan and Kirwin continued to assure Mr. Maimone that the beta testing would happen "any day." They told Mr. Maimone that arrangements had been made for M Casino in Henderson, Nevada to perform the beta testing. These statements were false in that beta testing had not been arranged and there were no plans for an OmniTable to be placed at the M Casino in Henderson, Nevada.

40.    Defendant Mulligan asked Mr. Maimone to invest the remaining $80,000 for the full 5% ownership interest. Again, Defendant Mulligan asked Mr. Maimone prepare a check payable to Defendant Mulligan personally. While they were in Las Vegas, between

10

September 29 and October 1, 2015, Mr. Maimone invested the remaining $80,000.00 to complete his $160,000.00 contribution in exchange for a 5% ownership interest in NMG.

41.    Plaintiff Maimone is and has always been a passive investor in NMG.

42.    In offering the ownership interests for sale to Plaintiff Maimone, Defendants made affirmative representations, and omitted to inform Maimone of information that they had a duty to disclose. Defendants' affirmative representations and omissions in connection with the sale and purchase of the securities were false.  Defendants' statements and omissions were material to Plaintiff's investment.  Defendants made the material misrepresentations with knowledge of their falsity and with the intent to defraud Maimone. Absent Defendants' material misrepresentations and omissions, Plaintiff Maimone would not have purchased the securities. Plaintiff Maimone reasonably and justifiably relied on Defendants' material misrepresentations and omissions.  As a result, Plaintiff Maimone has suffered economic loss, and the diminution in the securities' value was caused by Defendants' misrepresentations, omissions, and failure to live up to the false promises they made to Plaintiffs.

**False Statements to Induce Mr. Caruso's Investment**

43.    After his experience and observations at the G2E, Mr. Maimone introduced co-Plaintiff Mr. Caruso to Defendant Mulligan

44.    Defendant Mulligan met with Mr. Caruso in between October 1 and 15, 2015, upon information and belief at Caffe Aldo Lamberti in New Jersey. In Plaintiff Caruso's conversations with Defendant Mulligan, Defendant Mulligan made affirmative misrepresentations and omissions as the Founder and President of NMG.

45.    Defendant Mulligan explained the OmniTable to Mr. Caruso. He represented that the table was patented, and that the OmniTable IP belonged to NMG. Defendant Mulligan

11

represented that NMG was then worth $50 million and that it would be worth $100 million after the beta testing in casinos was completed. Defendant Mulligan implied to Mr. Caruso that arrangements had been made for thousands of OmniTables to be placed in casinos for beta testing. Mr. Mulligan also described other products developed by different companies that had been purchased by casinos and larger gaming manufacturers for hundreds of millions of dollars, suggesting that NMG was worth far more than it was. Defendant Mulligan's representations to Mr. Caruso were false in that NMG does not and has never owned the OmniTable IP; there were no entities interested in purchasing the OmniTable IP, and NMG was never worth what Defendant Mulligan represented it to be. Defendant Mulligan made promises and representation as to the future which were beyond reasonable expectation and/or were unwarranted by existing circumstances.

46.    Defendant Mulligan asked Mr. Caruso to invest $500,000 in NMG in exchange for a 10% ownership interest in the Company.

47.    On December 1, 2015, Plaintiffs Maimone and Caruso received from Defendant Kirwin an Executive Summary prepared for potential investors in NMG. The Executive Summary is attached as Exhibit 5 to Caruso Affidavit filed herewith. The Executive Summary, in a section labelled "Competitive Advantage," states, "Our company's advantage is our patented technology and first mover advantage...." This representation was false because NMG did not then hold nor has it ever held the intellectual property protection on the OmniTable. Defendant Mulligan holds the patent and patent applications personally.  Moreover, neither NMG nor any other Defendant (nor, indeed, any person) has ever taken the necessary steps to protect the OmniTable IP or to monitor for patent infringement.

12

48.   Along with their receipt of the Executive Summary, Plaintiffs received from Defendants a five-year forecast ("Forecast") of the earnings and profits the Defendants supposedly anticipated for NMG. A true and correct copy of the Forecast is attached as Exhibit 8 to the Caruso Affidavit filed herewith. The Forecast was prepared by Defendant Kirwin to investors to purchase ownership interests and to attract potential strategic partners to invest in or work with NMG. This document projects that NMG will earn $18 million in profits on the lease of the table and $25 million in profits for table advertising within the first five years. Plaintiffs Maimone and Caruso invested in 2015 and 2016. The Company has been in operation for 3 years and 7 months to date and has zero dollars ($0) in sales. The OmniTable has not been beta tested. It remains no more than a prototype. NMG owes nearly $100,000 to manufacturers. The Forecast made predictions that were beyond reasonable expectation and/or were unwarranted by existing circumstances.

49.   Defendant Kirwin, NMG, and any other Defendants who distributed the five-year forecast deliberately misrepresented the projected growth and income for NMG and therefore the value of NMG securities, with the intention of deceiving investors. Plaintiffs and other investors who reasonably relied on the document in purchasing their securities, and the Defendants' misrepresentations have resulted in financial losses to Plaintiffs and other investors.

50.   Defendant Mulligan represented that a person of Mr. Caruso's wealth and business acumen as an Investor in NMG would greatly benefit NMG because according to Defendant Mulligan, NMG's CFO Robert Robertson had recently lost his wife, and for that reason, Mr. Robertson was resigning from his position with NMG. Mulligan's statement was false in that Mr. Robinson was divesting himself of his interest in NMG because he

13

was unhappy working with Mr. Mulligan and Mr. Kirwin, and disapproved of how they operated the business. Mr. Robertson was afraid he could ultimately be liable for their wrongdoing.

51.    Defendant Mulligan further represented to Plaintiff Caruso that he was dissatisfied with Defendant Kirwin's performance as CEO of NMG. Defendant Mulligan's statements were false in that Mulligan had no intention of separating himself or NMG from Kirwin.

52.    Defendant Mulligan represented to Plaintiff Caruso that he intended to take more control over the direction of the Company. He asked Mr. Maimone and Mr. Caruso to assist in the decision-making for the Company from that date forward. Defendant Mulligan's statements were false in that there was no intention to allow Mr. Caruso or Ms. Maimone further involvement in operating NMG.

53.    Because of Defendant Mulligan's misrepresentations, Mr. Caruso agreed to invest in NMG, contingent upon the following changes in NMG's management:

     a.  Mr. Caruso's bookkeeper, Stacy Zane, would become the bookkeeper for NMG (because NMG was without a bookkeeper), and Mr. Caruso would bear the expense of Ms. Zane's engagement until further notice;

     b.  A bank account would be opened in New Jersey with Ms. Zane as a signer and Defendant Mulligan as co-signer (two signature checks) for NMG's expenses;

     c.  All expenditures for NMG would be submitted in advance for review and approval by Mr. Caruso, Mr. Maimone, and Defendant Mulligan, collectively;

14

    d. NMG (which was then without an accountant) would engage Mr. Caruso's accountant, Jeffrey Sollenberger, to review the bookkeeping and file tax returns; and

    e. NMG would engage experienced legal counsel to advise it and its management regarding corporate structure, fund-raising regulations and casino gaming law.

54.    Defendant Mulligan agreed to the structural changes to NMG set forth in the foregoing Paragraph. Defendant Mulligan, however, had no intention of fulfilling his promises, even though Mr. Caruso relied on his statements and those false statements were critically important to Mr. Caruso's investment.

55.    Mr. Caruso's initial payment toward his investment in NMG was for $15,000 paid directly to Defendant Timothy Mulligan. This payment was was supposedly paid in exchange for the release of NMG's books and records to Mr. Caruso.

56.    Mr. Caruso's second investment in NMG, at Defendant Mulligan's request, was paid directly to Robert Robertson, supposedly in exchange for Mr. Robertson's 4% interest in NMG. Mr. Caruso, who is an attorney licensed in the State of New Jersey, drafted a release of Mr. Robertson's 4% share in NMG to himself. Nevertheless, the release was never provided to Mr. Caruso. Instead, Defendant Mulligan took the 4% back as part of his own personal ownership interest share in NMG.

57.    Mr. Caruso's third payment for his supposed 10% share in NMG was made on November 13, 2015 in the amount of $50,925.00. At the direction of Defendant Mulligan the money was paid directly to Translux, a manufacturer of the OmniTable, as a 50% deposit on six gaming tables NMG had supposedly decided to purchase for purposes of sales, marketing, and beta testing.

15

58.     The decision to purchase the tables from Translux was made on behalf of NMG by Defendant Cruz and Mr. Olshenski (a consultant to Defendant Cruz and Defendant Mulligan) at a meeting in Cherry Hill, New Jersey at which Mr. Caruso and Mr. Maimone were present.

59.     The payment to Translux was for naught, since Defendants never paid the balance and never took delivery of the OmniTables.

60.     Mr. Caruso's fourth payment of his investment in NMG was made on November 24, 2015 in the amount of $45, 251.00. Mr. Caruso's total investment by the end of November 2015 was $174,176.00.

61.     Shortly after the tables were supposedly ordered, Mr. Caruso and Mr. Maimone saw an urgent notice and invoice from NMG patent counsel. The attorney advised that he had been asking for funds to file patents in other (worldwide) jurisdictions, that time was running out, and that NMG had not paid him to file the patents.

62.     None of the Defendant Managers of NMG had disclosed the unpaid obligations of the Company prior to Plaintiffs' discovery of those unpaid obligations in late November 2015. These were material omissions of information that Defendants had a duty to disclose to Investors. The omissions were intended to deceive Plaintiffs.

63.     In offering the ownership interests for sale to Plaintiff Caruso, Defendants made affirmative representations, and omitted to inform Caruso of information that they had a duty to disclose. Defendants' affirmative representations and omissions in connection with the sale and purchase of the securities were false.  Defendants' statements and omissions were material to Plaintiffs' investment.  Defendants made the material misrepresentations with knowledge of their falsity and with the intent to defraud Caruso. Absent Defendants' material misrepresentations and omissions, Plaintiff Caruso would

16

not have purchased the securities. Plaintiff Caruso reasonably and justifiably relied on Defendants' material misrepresentations and omissions.  As a result, Plaintiff Caruso has suffered economic loss, and the diminution in the securities' value was caused by Defendants' misrepresentations, omissions, and failure to live up to the false promises they made to Plaintiffs.

## Defendant's Failure to Honor Their Commitments and Other Bad Acts

64.   The financial books and records were never turned over to Mr. Caruso as agreed.

65.   Mr. Caruso is a passive investor in NMG.

66.   The draft Assignment of Ownership interest from Mr. Robinson was never provided to Mr. Caruso as promised.

67.   In late November or early December 2015, Plaintiffs Maimone and Caruso demanded the financial books and records of the company. Plaintiffs demanded to know how the $160,000 paid Plaintiffs to Defendant Mulligan had been spent. Plaintiffs declined to make any further investment unless the books and records of NMG were turned over.

68.   In late November or early December 2015 Mr. Maimone and Mr. Caruso learned that Defendant Mulligan had used Mr. Maimone's $160,000 for his own selfenrichment and had failed to fund NMG with Mr. Maimone's investment.

69.   The Company's 2014 tax return, which had been prepared by Defendant Kirwin personally, was turned over to Plaintiff in or about December 2015. A true and correct copy of the tax return is attached as Exhibit 4 to the Caruso Affidavit filed herewith.

70.   Analysis of the 2014 tax return revealed that Defendant Kirwin had illegally claimed 37.5% of the losses of NMG for himself, although Defendant Kirwin did not then and has never owned  37.5% of NMG. Plaintiffs further discerned that the Company's 2014 tax

return did not show K-1 partner forms for all members and did contain K-1 partner forms for entities that were not members of NMG. Copies of the respective Membership Lists are attached at the end of the Operating Agreement which is Exhibit 1, as well as Exhibits 2 and 3 to the Caruso Affidavit filed herewith.

71.    The tax return had not been prepared in accordance with Generally Accepted Accounting Principles. The Company had improperly accounted for income, expenses and capital investments.

72.    In December 2015, Mr. Caruso and Mr. Maimone confronted Defendants Mulligan and Kirwin regarding the false tax return.

73.    Defendant Kirwin responded by claiming (falsely) that Defendant Mulligan had given him 34% of NMG, which would not account for his claiming 37.5% of the ownership interest in NMG.

74.    Defendant Mulligan confirmed that Defendant Kirwin never owned 37.5% of NMG.

75.    The discovery of the false tax return filed by Defendant Kirwin, and the failure of Defendants to provide the financial books and records of the company, caused Mr. Caruso to demand the return of his investment of $174,176.00 in NMG.

76.    Notwithstanding Mr. Caruso's demand, Defendant Mulligan implored Mr. Caruso to continue his investment in the Company.   Mulligan said he wanted Mr. Caruso's business expertise. Defendant Mulligan's statement was false. Mulligan did not intend to permit Mr. Caruso to be involved in the management of NMG.

77.    Defendants' continued misrepresentations in seeking Plaintiff Caruso's continued investment in NMG were affirmative representations, or omissions to inform Caruso of information that they had a duty to disclose. Defendants' affirmative representations and omissions made in connection with the sale and purchase of the securities were false.

18

Defendants' statements and omissions were material to Plaintiffs' continued investment. Defendants made the material misrepresentations with knowledge of their falsity and with the intent to defraud. Absent Defendants' material misrepresentations and omissions, Plaintiff Caruso would not have continued to invest in the securities. Plaintiff Caruso reasonably and justifiably relied on Defendants' material misrepresentations and omissions. As a result, Plaintiff Caruso has suffered economic loss, and the diminution in the securities' value was caused by Defendants' misrepresentations, omissions, and failure to live up to the false promises they made to Plaintiffs.

**Further Bad Acts, Waste, and Diversion of Company Opportunities**

78.     In or about December 2015, Mr. Caruso and Mr. Maimone learned that the patent attorney was still owed $100,000, and that other Company responsibilities to consultants and employees of NMG had not been met. These unmet obligations of NMG were material omissions by the Defendant Managers of NMG that they had a duty to disclose in order to correct the misinformation they had previously supplied to Plaintiffs. The information was withheld with the intent to deceive or defraud Investors.

79.     After being confronted with his bad acts and the fact that he did not own 37.5% of NMG, Defendant Kirwin agreed personally to return Mr. Caruso's $174,176.00 investment, to fund the payment due to the patent attorney, and further, to fund the Company in the amount of $500,000.00 to keep the company in operation. Up until that time, upon information and belief, Mr. Kirwin had made no financial investment whatsoever in NMG, which had never been disclosed to Plaintiffs.

80.     Mr. Kirwin failed to live up to his promises. Mr. Kirwin's statements were false in that he did not fund the Company in the amount of $500,000.00.

81.     Defendant Kirwin paid the $174,176.00 to Plaintiff Caruso and paid the funds due to the patent attorney but failed to pay any consultants or employees. However, to date, neither Defendant Kirwin nor NMG has made the final payment due to Translux for the delivery of the six tables ordered at the direction of Defendant Mulligan and the OmniTables were never delivered.

82.     In or around early January 2016, Defendant Mulligan asked Mr. Caruso to reinvest by buying a 1.5% ownership interest from another investor.

83.     At Defendant Mulligan's urging, Mr. Caruso purchased the other investor's 1.5% interest in NMG for $25,000.00.

84.     Defendant Kirwin refused to execute the assignment unless Mr. Caruso executed a release of liability for all Defendant Kirwin's bad acts, which Plaintiff Caruso refused to do.

85.     Defendants Mulligan and Kirwin never wanted Plaintiffs to have any involvement in or control of NMG. Rather, they simply took the Investors' money.

86.     Since January 2016, on repeated occasions, when pressed for information on the direction of the company, or about Defendants Mulligan and Kirwin's discussions with suppliers, manufacturers and other potential strategic partners, the Defendant Managers have claimed that any response consisted of proprietary confidential information and could not be disclosed. These were false statements. Upon information and belief, the Defendant Managers have not had discussions with suppliers or manufacturers and have had discussions with only one potential partner, which came to nothing. The statements were made with the intent to deceive. And Plaintiffs relied on the misstatements in continuing to invest in NMG.

87.     Upon information and belief, Defendant Cruz either purchased or was gifted a 15% ownership interest in NMG by Defendant Mulligan to serve as a Manager of NMG.

20

88.     In addition, Defendant Mulligan has gifted a large portion of the ownership interests to friends and family for no consideration whatsoever. Mr. Maimone remains the single largest outside investor in NMG with 5% in exchange for $160,000. Together with Mr. Caruso, Plaintiffs own 6.5% of NMG ownership interests.

89.     The above facts were related to Defendant Cruz by Mr. Caruso and Mr. Maimone on a number of occasions during 2016 and 2017. Plaintiffs asked Defendant Cruz to step in and fulfill his role as Manager of NMG.

90.     Defendant Cruz refused to correspond or speak with Mr. Caruso and Mr. Maimone and he has refused to fulfill his fiduciary duty as an officer of NMG.

91.     As of the date of this filing, the Omni Table has never been beta tested as represented.

92.     Between 2015 and the date of this filing, no funds—other than Mr. Caruso's $50,925.00 direct payment to Translux (which was wasted because NMG never paid the balance due on OmniTables and therefore the tables were never delivered)—have been devoted to research and development or to finalize the OmniTable for sale as represented.

93.     Despite numerous requests in 2016 and 2017, Plaintiffs have been provided no information about who owns ownership interests in NMG, the amounts paid in consideration for those ownership interests, or to whom ownership interests have been given or sold.

94.     Between 2015 and up to the date of this filing, Defendant Mulligan has continued to sell ownership interests in NMG, which constitute unregistered securities, for his own personal enrichment.

95.     Defendant Mulligan has bought and sold ownership interests in NMG, which constitute unregistered securities, for his personal gain.

21

96.     There is no OmniTable in operation in Las Vegas or any other location for any potential clients to see, despite repeated demands from Mr. Maimone and Mr. Caruso to place an OmniTable there, and their offer to fund its placement.

97.     In early October 2016, Defendants Mulligan, Kirwin, and Cruz declined to attend the G2E (the largest gaming conference in the world) in Las Vegas, despite Defendants Mulligan, Cruz and Kirwin having repeatedly represented that their presence with the OmniTable at the G2E was essential to the successful release of the OmniTable to the casino industry.

98.     To protect their investment interests, and despite not being permitted by the Defendants to participate in the management or control of the company, in early October 2016, Mr. Caruso and Mr. Maimone attended the 2016 G2E at their own expense. Plaintiffs advised Defendants Mulligan and Kirwin that they had arranged for a casino operator from London, who had agreed to assist in beta testing the OmniTable, to examine it at the G2E.

99.     Defendant Mulligan stated that NMG had no money to place the table at the G2E. He confessed that he had a "comped" suite at one of the casinos. He agreed to arrange to have the table in Las Vegas for examination, "even if [he had] have to drive the table out to Vegas [him]self." Defendant Mulligan's statement was false and made with the intent to deceive since Mulligan had no intention of getting the OmniTable to Las Vegas.  Plaintiffs Maimone and Caruso relied on his statement. The statement was material to Plaintiffs' continued investment in NMG.

100.    Mr. Caruso and Mr. Maimone advised the casino operator that the OmniTable would be available for examination in a suite, rather than on exhibit at the G2E. The casino operator reluctantly agreed to see the table outside of the conference exhibit.

101.   Despite Defendant Mulligan's repeated assurances, the OmniTable was never sent to Las Vegas to be viewed, and NMG's reputation further suffered.

102.   Plaintiffs later learned that Defendants Mulligan and Kirwin purposefully stayed away from the G2E because they met in New York with a potential investor, known as Tiller (a/k/a Tiller Capital Ltd., Tiller International Group, and /or Tiller Group), which had instructed them not to attend the G2E.

103.   Plaintiffs discovered that, during the 3rd quarter of 2016, Defendants Mulligan and Kirwin were so enamored with Tiller's potential investment that they attempted to get all the other members of NMG (except Plaintiffs) to agree to a business arrangement with Tiller, without even knowing what business arrangement would be proposed. Plaintiffs were provided no details about the proposed investment by Tiller or its terms.

104.   In the 3rd or 4th quarter of 2016, Mr. Maimone and Mr. Caruso requested a meeting in Cherry Hill with Defendants to obtain an explanation of the proposed deal with Tiller. During the requested meeting, Defendant Kirwin explained that Tiller would manufacture all NMG's gaming tables using carbon fiber (as used in seats for U.S. Air Force jets) and that the OmniTables would be made at less than half the cost of any alternative manufacturer. Defendants Kirwin and Mulligan represented that Tiller planned to use the tables in poker rooms and that Tiller had promised to place thousands of tables in the first year. Defendant Kirwin's and Mulligan's statements were false and their misrepresentations were material. Tiller never became a strategic partner nor did any business with NMG.

105.   Mr. Caruso and Mr. Maimone inquired of Defendant Kirwin about the details of the business deal with Tiller. Plaintiffs asked for the terms of the investment; a basic outline of the deal for NMG Investors; an estimated timeline; an estimated amount of return on

23

investment; what percentage of ownership (if any) of NMG Tiller would own; what Tiller's role would be (if any) in the Company's management; what Defendants Mulligan and Kirwin's roles would be; what contracts or payments Defendants Mulligan and Kirwin were negotiating for themselves; and why the OmniTables would be used as tables in poker rooms (since they are not poker tables).

106. Defendants Mulligan and Kirwin were unwilling to answer Plaintiffs' questions.

107. Plaintiffs inquired why Defendants Mulligan and Kirwin needed every investor's written approval to negotiate an offer from Tiller, given that they are ostensibly empowered as Officers of NMG to represent NMG. Defendants either could not or would not answer. These omissions were material and Defendants had a duty to disclose the information.

108. Defendants Mulligan and Kirwin instead said "Tiller needed it." They refused to reveal the nature of the arrangement with Tiller because it was "confidential" and they were bound by a non-disclosure agreement. These omissions were material and Defendants had a duty to disclose the information.

109. Upon information and belief, Tiller never presented an offer to Defendants Mulligan and Kirwin, nor did Tiller invest in NMG.

110. Defendants' continued misrepresentations in seeking Plaintiffs' continued investment in NMG were affirmative representations, or omissions to inform Plaintiffs of information that they had a duty to disclose. Defendants' affirmative representations and omissions made in connection with the sale and purchase of the securities were false. Defendants' statements and omissions were material to Plaintiffs' continued investment. Defendants made the material misrepresentations with knowledge of their falsity and with the intent to defraud. Absent Defendants' material misrepresentations and omissions,

24

Plaintiffs would not have continued to invest in the securities. Plaintiffs reasonably and justifiably relied on Defendants' material misrepresentations and omissions. As a result, Plaintiffs have suffered economic loss, and the diminution in the securities' value was caused by Defendants' misrepresentations, omissions, and failure to live up to the false promises they made to Plaintiffs.

111. The three Membership Lists that have been provided to Plaintiffs, in addition to the investments of $25,000 and $160,000 by Plaintiffs, purport to show an additional $236,000 invested in NMG. Those reflected in the K-1 forms attached to the 2014 tax return, over and above those reflected on the membership lists, show another $135,415 invested in NMG. Defendant Kirwin's refund to Plaintiff Caruso accounts for yet another $174,176. And Defendant Kirwin allegedly paid the attorneys' fees in the amount of at least $100,000 for filing the patents. This translates to $830,561 invested prior to February 2016 into a Company that is worthless.

**Damage to the Company**

112. Plaintiffs have been told by casino executives that Defendant Kirwin is a "used car salesmen" and Defendant Mulligan is "the broke guy with his hand out."

113. Defendants' mismanagement has seriously damaged NMG's ability to do business in the industry. Defendants have been unable to move the company forward.

114. Instead of bringing in strategic partnerships that would allow the OmniTable to be developed and sold, Defendant Mulligan has offered (by both sale and gift) ownership interests to a variety of persons at all different prices in violation of securities regulations.

115. The securities that Defendants Mulligan and NMG are offering for sale are unregistered.

116.   Defendant Mulligan has used the money from selling ownership interests in NMG, which constitute unregistered securities, for his own personal gain, and has failed to invest the funds into NMG or for the development of the Company's only product.

117.   Defendants Mulligan and Kirwin have subjected NMG to mockery and have ruined its reputation in the gaming industry.

118.   Casino executive have refused to do business with NMG while Defendants Mulligan and Kirwin remain involved.

119.   Upon information and belief, Defendants Cruz and Blanchett are aware of Defendants Mulligan and Kirwin's bad acts and have failed to fulfill their fiduciary duties as officers and managers of NMG to put a stop to them.

120.   Contrary to the repeated representations of Defendants Mulligan and Kirwin, NMG has never owned the OmniTable IP. These representations were false and were material to Plaintiffs' investments.

121.   All investments in NMG are currently worthless because NMG owns nothing and sells nothing. It is a mere shell used by Defendant Mulligan to steal funds by engaging in the sale of unregistered securities that are worthless.

122.   When confronted with the failure to assign the OmniTable IP to NMG, Defendant Mulligan has repeatedly promised to assign the OmniTable IP to NMG. The assignment paperwork has been drafted by the patent attorney, but to date Defendants Mulligan and Blanchett have failed to accomplish the assignment.

123.   Upon information and belief, none of the Defendants has acted in the best interest of NMG to remain vigilant about enforcing NMG's rights concerning the OmniTable IP, or to engage a competent intellectual professional attorney to do so.

124.   On or about July 2016, Mr. Caruso and Mr. Maimone learned that Defendant Mulligan intended to form a separate company owned by himself and Defendant Blanchett alone ("Newco"), and to assign the OmniTable IP to Newco. Newco in turn would license the OmniTable IP to NMG and others, to the detriment of NMG and its investors, including Plaintiffs. When Defendant Kirwin was confronted by Mr. Caruso during the 3rd quarter of 2016 regarding the creation of and assignment to Newco, he refused to exercise his role as the CEO, and to fulfill his fiduciary duties, to demand that Defendant Mulligan assign the OmniTable IP to NMG.

125.   The Defendant Managers herein have refused to compel Defendants Mulligan and Blanchett to complete the assignment despite being on notice of Defendant Mulligan's fraud and his conspiracy with Defendant Blanchett to defraud NMG and the other investors. These were breaches by the Defendant Managers of their fiduciary duties.

126.   Defendant Kirwin, still named as CEO of NMG on its website, has now publicly announced that he is no longer involved in the management of NMG and has publicly dissociated himself from NMG. Defendant Kirwin simply abandoned his fiduciary duties and left the Investors holding ownership interests in a worthless company and Defendant Mulligan fleecing the investors for his own personal gain.

127.   By offering to sell them interests in NMG, an LLC, Defendants repeatedly offered Plaintiffs "contract[s], transaction[s] or scheme[s] whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party," which the United States Supreme Court has held to constitute an offer of the sale of securities.

128.   The securities offered to Plaintiffs and to other members of the public are unregistered and currently worthless.

27

129.   As a result of the Defendants' multiple and repeated misrepresentations, NMG along with Plaintiffs Mr. Maimone and Mr. Caruso have suffered, and continue to suffer, severe financial and reputational damages.

130.   The Plaintiffs and NMG are continuing to suffer irreparable harm, especially while the OmniTable IP remains personally in the name of Defendant Mulligan, and while no efforts are being made to promote the OmniTable or to advance the business of Company.

## CLAIMS FOR RELIEF

**WHEREFORE**, Plaintiffs Maimone and Caruso, on behalf of themselves and on behalf of NMG, assert the following claims:

**COUNT 1:**   **Violations of Section 10(b) of the Securities Exchange Act of 1934; Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and Securities and Exchange Commission Rule 10b-5, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240 (Plaintiffs Against Defendants NMG, Mulligan, and Kirwin).**

1.   Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

2.   Defendants sold or gifted ownership interests in NMG, which constitutes the sale of securities.

3.   Defendants by issuing ownership interests for unit pricing, inter alia, engaged in the sale of financial "securities."

4.   The securities Defendants are both selling and gifting are unregistered.

5.   The Investors are not permitted to play any significant role in the management of the company.

6.   The Investors are not permitted to vote on the direction of the company or the decisions made by the manager members.

7.   The Investors did not negotiate the terms of the LLC agreement which were formed by Defendant Mulligan on "Legal Zoom" prior to selling "ownership interests."

28

8.    The Defendant Managers have never held any investor meetings, have never issued complete investor updates, and have never provided financial disclosures to Investors despite repeated requests.

9.    Defendant Mulligan is selling and giving away "ownership interests" in NMG, and has not disclosed to Investors to whom the ownership interests have been given, or are being sold and at what price.

10.   Defendant Mulligan is also engaged in buying and selling ownership interests in NMG for his own personal gain.

11.   The ownership interests sold to Plaintiffs are worthless securities because there is nothing of value to support them.

12.   Indeed, there has never been anything of value in NMG, because Defendants Mulligan and Blanchett have never completed the assignment of the only thing of value, *i.e.*, the OmniTable IP, to NMG.

13.   NMG has never had legal counsel specific to protect and enforce the company's rights related to the OmniTable IP, to protect investor interests by ensuring compliance with all applicable laws and regulations, nor has it had independent bookkeeping and independent accounting or auditing.

14.   Defendants Mulligan and Kirwin, and by the acts of Defendants Mulligan and Kirwin and its other agents, NMG made material misrepresentations and/or omissions made when they had a duty to disclose information to Plaintiffs.

15.   NMG made material misrepresentations and/or omissions made when they had a duty to disclose information to Plaintiffs.

16.   Defendants' misrepresentations and omissions were material to the Plaintiffs' investment and continued investment in NMG.

29

17.     Defendants' misrepresentations and omissions were made, with knowledge of their falsity or with reckless disregard as to whether the representations were true or false.

18.     The representations and omissions were made with the intent of misleading the plaintiffs into relying on them.

19.     Plaintiffs relied on Defendants' misrepresentations and omissions in making and continuing to make investments in NMG.

20.     Defendants' material misrepresentations and omissions caused Plaintiffs to invest in NMG.

21.     As a result of Defendants' misrepresentations and omissions, the plaintiffs have suffered economic loss.

22.     Plaintiffs' economic loss was caused by Defendants' material misrepresentations and omissions.

23.     The diminution in the value of Plaintiffs' ownership interests in NMG was caused by Defendants' material misrepresentations and omissions.

24.     Accordingly, Defendants NMG, Mulligan and Kirwin are liable to Plaintiffs under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b); and 17 C.F.R. § 240.10b-5; Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and Securities and Exchange Commission Rule 10b-5, 17 CFR §240.10b-5.

**COUNT 2:   <u>Violations of the New Jersey Securities Laws (Plaintiffs Against Defendants NMG, Mulligan, and Kirwin).</u>**

25.     Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

26.     Defendants sold or gifted ownership interests in NMG, which constitutes the sale of securities.

27.     Defendants Mulligan, Kirwin, and, because of the agency of Mulligan and Kirwin and other Defendant Managers, NMG, made misrepresentation by word, conduct or other manner of material facts.

28.     Defendants Mulligan, Kirwin, and NMG failed to disclose material facts, present or past, that they had a duty to disclose.

29.     Defendants Mulligan, Kirwin, and NMG made promises and representation as to the future which were beyond reasonable expectation and/or were unwarranted by existing circumstances.

30.     Defendants have made numerous unlawful acts and omissions in connection with the sale of securities n violation of the New Jersey Uniform Securities Law, New Jersey Statutes Article 49.

31.     Defendants Mulligan, Kirwin, and NMG engaged and continue to engage in a course of conduct or business calculated or put forward with intent to deceive the public and/or purchasers of any securities concerning the nature of transactions and the value of the securities.

32.     Defendants Mulligan, Kirwin, and NMG engaged and continue to engage in artifice, agreement, device or scheme to obtain money, profit or property by acts or omissions prohibited by the New Jersey Uniform Securities Law.

33.     Defendants Mulligan, Kirwin, and NMG engaged in the conduct and omissions described herein with the intent to deceive investors.

34.     Defendants' material misrepresentations and omissions cause Plaintiffs to invest in NMG.

35.     Plaintiffs reasonably and justifiably relied on Defendants' material misrepresentations.

36.    As a result of Defendants' misrepresentations and omissions, the plaintiffs have suffered economic loss.

37.    Plaintiffs' economic loss was caused by Defendants' material misrepresentations and omissions.

38.    The diminution in the Company's value was caused by Defendants' material misrepresentations and omissions.

**COUNT 3:**   **Fraud (Plaintiffs Against Defendants NMG, Mulligan, and Kirwin)**

39.    Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

40.    Defendants Mulligan and Kirwin, and by and through their actions as officers and agents, NMG, made numerous material misrepresentations of then-present or past facts to Plaintiffs Maimone and Caruso.

41.    NMG made material made numerous material misrepresentations of then-present or past facts to Plaintiffs Maimone and Caruso.

42.    Defendants Mulligan, Kirwin, and NMG knew that the statements they made to Plaintiffs Maimone and Caruso were false.

43.    Defendants Mulligan, Kirwin, and NMG made the misrepresentations with the intent that Plaintiffs Maimone and Caruso would rely on the misrepresentations.

44.    Plaintiffs Maimone and Caruso reasonably relied on the misrepresentations of Defendants Mulligan, Kirwin, and NMG.

45.    Plaintiff Maimone and Caruso suffered damages on account of the false misrepresentations of Mulligan, Kirwin, and NMG, and Plaintiffs' reasonable reliance thereupon.

46.    Accordingly, Defendants Mulligan, Kirwin, and NMG are liable to Plaintiffs for fraud.

**COUNT 4**:  **Breach of Contract (Plaintiffs Against All Defendants)**

47.    Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

48.    In selling ownership interests in NMG to Plaintiffs, the Defendant Managers and NMG entered into a contractual relationship with Plaintiffs and owe to Plaintiffs the contractual obligations set forth in the Operating Agreement of NMG.

49.    The Operating Agreement requires that, other than a transfer of interest, for any additional person to become a member and be issued any ownership interest in NMG, it can occur "if approved by and on terms determined by a unanimous written agreement signed by all of the existing [m]embers." *See* Operating Agreement at ¶2.3(A), Exhibit 1 to Caruso Affidavit filed herewith.

50.    The Operating Agreement also requires that, unless otherwise agreed to by the unanimous consent of the Members, any income, gain, loss, deduction, or credit will be allocated for tax purposes on a pro rata basis in proportion to the respective Percentage Interest held by each Member and in compliance with applicable tax laws." *See id.* ¶3.1.

51.    The Operating Agreement requires that all the Company's accounting records and a full and accurate record of each Company transaction "must be kept at the Company's principal executive office and must be open to inspection and copying by the Members during normal business hours *upon* reasonable notice . . . ." *Id.* ¶5.1.

52.    The Operating Agreement requires that, "within 45 days after the end of each taxable year, the Company will use its best efforts to send each of the Members all information necessary to complete their federal and state tax information, returns, and reports, and a copy of the Company's federal, state, and local tax information or income tax returns and reports for such year." *Id.* at ¶5.3.   Neither Plaintiff has received such

33

information for 2015 or 2016 or ever received a K-1 from NMG despite their ownership interests.

53.    Accordingly, NMG and all the Defendant Managers have materially breached the Operating Agreement and remain in breach thereof.

54.    Plaintiffs have not breached their duties with respect to the Operating Agreement.

55.    As a result of Defendants' material breaches of the Operating Agreement, Plaintiffs have been injured and are entitled to damages.

## COUNT 5: Breach of the Covenant of Good Faith and Fair Dealing (Plaintiffs Against the Defendant Managers)

56.    Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

57.    Every contract in either New Jersey or Pennsylvania contains an implied covenant of good faith and fair dealing.  A party to a contract cannot act in bad faith to interfere with the others' ability to enjoy the fruits of the contract.

58.    Defendant Kirwin, as the "Tax Managing Partner" for NMG, breached the covenant of good faith and fair dealing by claiming to own 37.5% of NMG when, upon information and belief, he has never owned more than 25% at most, and even that 25% would necessarily include a transfer of Mr. Caruso's 10% ownership interests to Kirwin.

59.    The Defendant Managers breached the covenant of good faith and fair dealing in failing to provide copies of NMG books, records, and tax returns to Plaintiffs upon request, and/or to permit inspection of the books and records upon reasonable notice.

60.    The Defendant Managers have breached the covenant of good faith and fair dealing in not allocating on a pro rata basis the losses (or gains) of NMG by ownership interest, and in failing to provide Plaintiffs with that information in the form of a K-1 to be included with Plaintiffs' own tax returns.

61.     Defendants Mulligan and Blanchett have breached the covenant of good faith and fair dealing in failing to accomplish the transfer of the OmniTable IP to the Company.

62.     Defendants Mulligan and Kirwin have breached the covenant of good faith and fair dealing in selling ownership interests in NMG  by engage in a course of conduct calculated to deceive the public and/or purchasers of ownership interests about the value of the securities.

63.     Defendants Mulligan and Kirwin engaged and continue to engage in artifice, agreement, device or scheme to obtain money, profit or property in violation of the covenant of good faith and fair dealing.

64.     Defendants Mulligan and Kirwin breached the covenant of good faith and fair dealing in promising and or issuing ownership interests in NMG in contravention of the Operating Agreement's requirements concerning the addition of new members.

65.     The Defendants Managers acted with ill motives and without any legitimate purpose to destroy the Plaintiffs' reasonable expectations from their investments.

66.     Because of Defendant Managers breaches of the covenant of good faith and fair dealing, Plaintiffs have been damaged and are entitled to damages.

**COUNT 6: <u>Negligent Misrepresentation (Plaintiffs Against Defendants NMG, Mulligan, and Kirwin)</u>**

67.     Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

68.     Defendants Mulligan and Kirwin made numerous incorrect statements about NMG and on behalf of NMG.

69.     Defendants Mulligan and Kirwin made those incorrect statements without regard for whether the statements were true or false.

35

70.   Plaintiffs Maimone and Caruso justifiably relied on Defendants Mulligan and Kirwin's incorrect statements.

71.   Plaintiffs Maimone and Caruso have suffered economic harm resulting from their reliance on Defendants Mulligan and Kirwin's incorrect statements.

72.   Accordingly, Defendants Mulligan Kirwin, and NMG are liable to Plaintiffs for negligent misrepresentation.

**COUNT 7:   Unjust Enrichment (Plaintiffs and NMG Against Defendant-Managers, Mulligan, and Kirwin)**

73.   Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

74.   Defendants Mulligan and Kirwin received benefits from Plaintiffs Maimone's and Caruso's investment funds to the detriment of Plaintiffs and NMG.

75.   It is unjust for Defendants Mulligan and Kirwin to retain the benefits they gained from Plaintiffs Maimone's and Caruso's investment funds into NMG without paying for those benefits.

76.   Accordingly, Defendants Mulligan and Kirwin are liable to Plaintiffs Maimone and Caruso and to NMG for unjust enrichment.

**COUNT 8:   Civil Conspiracy (Plaintiff and NMG Against Defendant-Managers)**

77.   Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

78.   The Manager-Defendants, by collectively engaging in the misconduct set forth herein, acted in concert with a common purpose to commit an unlawful act or a lawful act by unlawful means or an unlawful purpose.

36

79.    All the named Defendants combined in an agreement or confederation with a common design to unlawfully deprive Plaintiffs Maimone and Caruso and NMG of Plaintiffs' monetary investment therein.

80.    Each of the Defendants is liable in full for the wrongful acts of the others in furtherance of the conspiracy.

81.    Accordingly, Plaintiffs Maimone and Caruso, along with NMG, are entitled to a judgment against all Defendants and each of them individually on the basis of Defendants' civil conspiracy to wrongfully deprive Plaintiffs of their investment funds and the return on those investments.

**COUNT 9:   Breach of Fiduciary Duty (Plaintiffs Against NMG Against Defendant Managers)**

82.    Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

83.    The Defendant-Managers, as Officers and Managers of NMG, pursuant to both statute and common law, owed and continue to owe fiduciary duties to NMG and to Plaintiffs as holders of ownership interests in NMG, including but not limited, to the duty to act always in the best interests of NMG, the duties of good faith and loyalty, the duty to make full and fair disclosure of all material facts, not to engage in activities that constitutes self-dealing, and not to engage in willful or recklessness misconduct in the management of NMG.

84.    In addition to other breaches of fiduciary duties, Defendant Kirwin has disavowed his relationship with NMG and has abandoned his fiduciary duties thereby.

85.    The Defendant Managers have breached their fiduciary duties to Plaintiffs by and through their actions and omissions.

86.    As a direct result of the Defendant-Managers' breached of their fiduciary duties, Plaintiffs and NMG have been damaged.

**COUNT 10: <u>Conversion (Plaintiffs and NMG Against Defendant Mulligan)</u>**

87.    Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

88.    Plaintiff Maimone and Caruso made a financial investment in NMG of $160,000.00.

89.    Plaintiffs intended the funds they invested in NMG to be spent for the benefit of NMG and the development of the OmniTable, in order that the value of NMG and their investment would be increased.

90.    Defendant Mulligan did not invest Plaintiffs' funds in NMG but rather used them for his own personal purposes.

91.    Defendant Mulligan has not returned Plaintiffs' funds to which Mr. Maimone has an immediate right.

92.    Thereby Defendant Mulligan wrongfully interfered with Plaintiffs' and NMG's right to their funds and is liable to Plaintiffs and to NMG for conversion.

**COUNT 11: Diversion of Corporate Opportunities (NMG against Defendant Managers)**

93.    Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

94.    Business opportunities were presented to all the Defendant Managers.

95.    NMG, with appropriate management, would have had the financial wherewithal to undertake those business opportunities.

96.    The business opportunities presented to the Defendant Managers were by their nature, in the line of NMG's business and would have been of practical advantage to NMG

97.   The business opportunities were such that NMG had an interest or reasonable expectancy that those business opportunities would have benefitted NMG.

98.   By embracing the opportunities, the self-interests of Defendant Managers would have been brought into conflict with the interests of NMG.

99.   By diverting the Company's opportunities, the Defendant Managers harmed NMG and are liable to it.

**COUNT 12: Waste (Plaintiffs on behalf of NMG Against Defendant Managers)**

100.   Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

101.   Defendant Managers had in their possession or at their disposal funds and assets (in particular the OmniTable IP) that should have been used for the benefit of NMG.

102.   By not spending the funds for the benefit of NMG or accomplishing the transfer of the OmniTable IP, and by failing to develop and market the OmniTable, the Defendant Managers committed waste of the Company's assets.

103.   Specifically, the Defendant Managers committed waste with respect to the $50,925.00 invested by Plaintiff Caruso via his payment made directly to Translux, in that they failed to pay the remaining balance and thus did not obtain the benefit of the money paid to Translux by taking delivery of the OmniTables.

104.   Accordingly, the Defendant Managers are liable to NMG.

**COUNT 13: Claims for Injunctive Relief (Plaintiff and NMG Against Defendant Managers**

105.   Plaintiffs repeat each and every foregoing allegation as if fully set forth herein.

106.   As a result of the irreparable harm occurring against NMG and Plaintiffs, Plaintiffs and NMG are entitled to equitable relief.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of NMG, seek the following:

**As to Count One** (Violations of Section § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 Against Defendants NMG, Mulligan, and Kirwin), Plaintiffs seek damages against Defendants NMG, Mulligan, and Kirwin, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand punitive damages for fraud, together with interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Two:** (Violations of the New Jersey Securities Laws (Plaintiffs Against Defendants NMG, Mulligan, and Kirwin), Plaintiffs seek damages against Defendants NMG, Mulligan, and Kirwin, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand punitive damages for fraud, together with interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Three** (Fraud Against Defendants NMG, Mulligan, and Kirwin), Plaintiffs seek damages against Defendants NMG, Mulligan, and Kirwin, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand punitive damages for fraud, together with interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Four** (Breach of Contract against all Defendants) Plaintiffs seek damages against Defendants NMG, Mulligan, and Kirwin, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and

Plaintiffs further seek interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Five** (Breach of the Implied Covenant of Good Faith and Fair Dealing against all Defendant Managers) Plaintiffs seek damages against Defendants NMG, Mulligan, and Kirwin, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further seek interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Six** (Negligent Misrepresentation against Defendants NMG, Mulligan, and Kirwin), Plaintiffs seek damages against Defendants NMG, Mulligan, and Kirwin, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Seven** (Unjust Enrichment on behalf of Plaintiffs and NMG Against Defendant-Managers, Mulligan, and Kirwin), Plaintiffs seek damages for themselves and for NMG against Defendants Mulligan, and Kirwin, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Eight** (Civil Conspiracy on behalf of Plaintiff and NMG Against Defendant Managers), Plaintiffs seek damages for themselves and for NMG against Defendant Managers Mulligan, Blanchett, Kirwin, and Cruz, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand punitive damages, interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

41

**As to Count Nine** (Breach of Fiduciary Duty on behalf of Plaintiffs and NMG Against Defendant Managers), Plaintiffs seek damages for themselves and for NMG against Defendant Managers Mulligan, Blanchett, Kirwin, and Cruz, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand punitive damages, interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Ten** (Conversion on behalf of Plaintiffs and NMG Against Defendant Mulligan) Plaintiffs seek damages for themselves and for NMG against Defendant Mulligan in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand punitive damages, interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Eleven** (Diversion of Corporate Opportunities on behalf of NMG against Defendant Managers), Plaintiffs seek damages for NMG against Defendant Managers, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand punitive damages, interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Twelve** (Waste behalf of NMG Against Defendant Managers) Plaintiffs seek damages for NMG against Defendant Managers, jointly and severally, in the amount of in the amount of $10,000,000.00 or in an amount to be proven at trial, and Plaintiffs further demand punitive damages, interest, attorney's fees, cost of suit, and whatever other relief the court deems appropriate;

**As to Count Thirteen** (Injunctive Relief behalf of Plaintiffs and NMG Against Defendant Managers), Plaintiffs initially seek only the following equitable relief:

1.      A Temporary Restraining Order ("TRO") from the Court enjoining all

Defendants from selling or offering to sell or otherwise transferring interests in Defendant NMG;

After a hearing to be scheduled by the Court, Plaintiffs also seek a Preliminary Injunction that accomplishes the following:

1. The continuation of the TRO;

2. An Order from the Court requiring, at the expense of the individuals Defendants Mulligan, Blanchett, Kirwin, and Cruz, a formal and independent accounting of Defendant NMG for the benefit of Plaintiffs Maimone and Caruso;

3. An Order from the Court enjoining all Defendants from dilution of Plaintiffs' and others' ownership interest by continuing to gift and/or sell further ownership interests NMG to any party;

4. An Order from the Court requiring that Defendants Mulligan and Blanchett immediately complete the paperwork required to ensure that US Patent No. 9,098,969 (referring to patent issued on the so-called OmniTable) issued June 18, 2014 to Defendant Mulligan; US Patent Application Nos. 14/816,579 (August 3, 2015); 14/930,881 (November 3, 2015); 61/976,230 (April 10, 2014); and 61/837,321 (June 20, 2013) relating to the OmniTable in the name of Defendant Mulligan; and any other intellectual property protections or applications worldwide referring to the OmniTable, regardless of jurisdiction, be transferred into the name of NMG; and

5. An Order from the Court enjoining and restraining the Defendant Managers from being indemnified by the Company for their costs of defending against this suit, including attorneys' fees, absent strict adherence to the requirements of the

Operating Agreement concerning such indemnification, as set forth in Article 9 thereof;

6. An Order for any other relief the Court deems equitable and proper.

Respectfully submitted,

DATE: 9|7|17

Evelyn R. Storch #016471981
HARWOODLLOYD, LLC
130 Main Street
Hackensack, NJ  07601
201-359-3556
estorch@harwoodlloyd.com

OF COUNSEL:

Keith Rosten, Esq.
Kathleen B. Havener, Esq.
ROSTEN LAW, PLLC
1020 16th Street NW
Suite 205
Washington, DC 20001
Telephone: 202-741-9190
Email: krosten@rostenlaw.com
        kbhavener@rostenlaw.com

44